The auto versus State Farm, Mr. Sherlock. Thank you, Your Honor. Good morning. If it pleases the Court, my name is Mark Sherlock. I represent the plaintiffs in this case, though we're talking in these five cases just about a handful of body shops overall in the MDL. We represent hundreds of primarily mom-and-pop automobile repair shops. And what we are complaining of is that the insurance companies have engaged in two lines of tactics with a single goal. And that ultimately is to depress the body shop's rates for automobile repair and also to ultimately drive them out of business. And to explain that, you have to understand this is kind of a unique situation. You're typical one corporation and then the consumer. We have insurance companies, clearly, and they have a contract with their insurers. On the other hand, we have not just one type of body shop, but two kinds, which actually made it impossible for us to do a class action. We chose MDL. You have body shops, our clients, whose number one loyalty, whose concentration is, whose duty is to their customer. To repair their car in a safe, responsible manner. Return it to the same condition if they can. There's another group of body shops whose loyalty lies directly to the insurance companies. At the end of the day, again, there's no contract between insurers and body shops. The contracts are with the consumer. At the end of the day, if the insurance companies in this plan, what we allege, can drive out the insured, the customer-centric shops to the benefit of the company insurer's centric shops, there's a problem. They have two tactics to do that, real quickly. The first tactic is an agreement. To set this, agree to an artificial, uniform rate of what they're going to pay for repairs and parts. And second is to force the shops to accept that rate by threatening this boycotting by presenting false and misleading statements that will drive customers away from those who are non-compliant. How many plus factors have you alleged in the complaint sufficient to allege that the insurers engaged in conscious parallelism? Yes, Your Honor. We, in the complaints, we have alleged at least a half a dozen plus factors. If I may just focus on maybe two. What are the primary ones? Primary ones are, first of all, that this isn't going to happen in the absence of independent action. This isn't going to be just independent action. This is not going to happen in the absence of the agreement. And the way we show that is, if you have one, right now, as we are alleging, a single rate that's paid by large insurance companies, small insurance companies, how is there competition there? There is no competition in that market. Right? So, why if, let's say, in cases, obviously, State Farm raises, decides to pay more in some circumstances. In fact, the smaller ones raise their rates. That is absolutely contrary to their independent, financial, good business sense. How is that different from traditional conscious parallelism? Well, we believe it's unnatural parallelism. Surely, we have to show parallelism. That's part of the agreement. I know you've put a majority of attitude to it, but how is it different? It's different in this respect. All right. It shows that they are not acting independent. This is not just a business decision. This is the conscious parallelism, Your Honor. It's what they only do because they have an agreement. It doesn't make... That happens in every case, or in most cases, of conscious parallelism. One of them raises it. The other parallel, raises it. Goes down, they go down. Right. How can conscious parallelism be a plus factor? We're not saying conscious parallelism is a plus factor. It's a plus factor. The plus factors are on top of that, Your Honor. All right. What are your plus factors, was the question. Okay. Uniformity, we believe uniformity is a plus factor. Certainly set forth by the courts and by this bill. Uniformity of what? You got two. Uniformity of prices is one, and uniformity of practices, are those the two? Absolutely. Yeah. The practice is how do they force that compliance with the uniform price is they steer people away. They use the boycotting aspect. They steer people, customers away from those noncompliant shops. And if you look at the overall picture of this and the history of this, starting with the consent decree, where Justice Department went after it for the exact same conduct. And, in fact, they at least agreed that there was sufficient evidence there that they consented to not do these things anymore. Your argument is that you've got 89 insurance companies, all in the, regardless of the geographic market. They all agree to abide by the market rate. That's agreed. That's right. And that's. Well, it's an artificial market rate. And that this would not happen in the absence of independent action. Is that your argument? That is exactly the argument. And so your argument is that that's enough to nudge your complaint over the threshold from conceivable or conceivable violation of Sherman 1 to a plausible violation of Sherman 1. Is that your argument? Our argument is that these facts that we have alleged, yes, those facts, suggest that there is a plausible grounds to infer an agreement and to infer the boycotting, the other forceful way to enforce that agreement. What about the practices? Sorry? Uniform practices. Uniform practices are, again, we allege this across the board for all dependents. The noncompliant, the ones who do not do the DRP, the special program, they sign up and they agree to pay these prices. They agree to use aftermarket parts, not safe parts. They agree. So if they don't do that, then the insurance companies uniformly will tell their insureds that is not a preferred shop. They won't pay for it. We won't guarantee their work, which is one of the most amazing statements, because they don't guarantee any work. But they tell that insured that shop, which is noncompliant, won't guarantee your work. They won't pay. We won't pay for you because it's going to take longer. We won't pay for a rental car, et cetera. And you keep saying they, they, they, but there's this debate in the briefing about whether or not there is, in fact, a script that these people are reading off of. Right. How can we infer an agreement just from the fact that you're alleging sort of they in the global are saying this guy's bad, he won't pay your rate, whatever? Well, we've alleged that all the defendants are doing this. We don't say that there is. In unison? I mean, as part of a conspiracy? This gets back to the chief's question. Yes. Yes, as part of this overall conspiracy. You see, you understand the progression of this. It's gone from that consent decree to let's have an agreement. We all pay the same rates. Next is we'll have DRPs, direct repair programs, so that there are noncompliant shops that we can all agree to. And then the next step is we start diverting people away from there. We start steering them away. Next they do is they say, well, let's all, let's have a insurance-owned parts trader so that the parts they're buying, the used parts, the Chinese parts, the unsafe parts, they're all having to use that. Then let's have an insurance-owned repair shop, a super repair shop out there. Ultimately, at the end of the day, this is harming the consumer. It takes away their choices. Maybe I want to pay more for my car, and I want qualified, experienced, and more expensive technicians. Of course, the consumer can still do that. The consumer can still do that. He has that choice. The insurance company pays what the insurance company will pay, and then the consumer pays for the additional amount for the brand-new part. With the experience and what we're alleging in here is that there are those consumers who have been going to the same body shop for generations. And this time they're told, you know what, you can't go there because of these reasons. You don't want to go there. I did not know you alleged that Allstate prohibits the consumer from going there as opposed to discourages it. Right. You're right. It is discouraged. It's a forceful discourage, and it's happening. And that's what we allege in the boycott. But the consumer still has the choice. The consumer can go there and pay extra. Right. They can. I mean, you're not exactly the consumer here. Well, if I may then take that question, Your Honor, and move it back to the conscious parallelism and the issue of whether they would do this conduct in the absence of this agreement in trying to compete. How does the small insurance company today compete with the large insurance company? Advertising? You see a lot of advertising out there on Super Bowl Sunday. There's lots of advertising. But is that pro-competitive? Does that help the consumer? What would help the consumer is to be able to lower rates, lower costs. At the end of the day, with the same payment they're all paying, you would think that they could keep the cost of insurance down, the premiums. They're not going down. They're not staying the same. They're going up. So in this— Counsel, let me ask you this question. Let's get back to the uniformity of price. It is true that you do allege—you don't allege a lot of the things you've said, like a company owned or insurance company owned body shops. That's not in the allegations. But you do allege uniformity of price, that State Farm calculates the market price in several geographic areas and sets that price, and it charges it. And then many of the cases involving this kind of parallel action, the court just says out of the blue, from its common experience, it says, well, what they're doing is following the leader. But not only is that obvious from common experience here, you actually allege it. You actually allege that they follow the leader. And the law is very clear, as you must acknowledge, that as Areta says, the courts unanimously hold that price leadership is not any indication of an agreement. Is that not true? Is that not almost unanimous in the case law? To an extent it is, but we believe the key question, and what you ask us to answer here, is whether that is a natural, if that is, influence because of the agreement. They're doing it because of the agreement, or for their own financial best interest, which to me flies in the face of reason as to why the small insurance company would follow the leader in this case, as opposed to saying, look, we're going to be a quality insurance company. We're going to pay for experts. We're going to pay for actual parts of the manufacturers that fit on that car. We don't have to drill new holes, try and make it fit, try and get that steering column in there. At the end of the day, it ends up costing the consumer even more because they're going to have additional repairs. It puts them at an unsafe angle. So why don't they do that? That is precisely the kind of argument that Springthorpe rejected in Twombly. You remember in Twombly the plaintiffs were arguing that these baby bells should go into the neighboring regional other baby bells territory. And they didn't do it, and they should have done it because they could have made some money that way. The Supreme Court rejected that out of hand, which seems to me to be more plausible than your suggestion here. I mean, why would not, when State Farm says it's not going to pay any more than this, why would any insurance company, following its rational, independent business judgment, pay more? As I just said, because their only way to compete with that big insurance company that has the market share, in any standard antitrust issue, the free market only works if antitrust protection is here, obviously. You know this. So make sure there's competition. And the only way to compete is to, for me, if I can't compete with the big guy step by step, I either have to do something that lowers my cost to the consumer or innovate and offer a better product. And in this case, that's what I'm arguing, Your Honor, with all due respect, is that they could come in and say, we want to be that better quality insurance company. Look, people are unsafe out there. Is there a difference between a price-fixing base and a division of the market case, which is what Tromley is in this case, is it? Yeah. Well, there is not a division of the marketplace here. And we haven't even hit on the point that, in fact, this is not an actual market rate. It's artificially created by State Farm. The way they put together this half plus one, if you'll read how they do it, they exclude the noncompliant shops who are charging higher rates. They don't even put that in there to make it a fair, true market rate for that community. That's why you might possibly have a tort, but that doesn't prove agreement. Well, we believe that the three or four or five that we've addressed plus factors do suggest, that's that important circumstantial evidence that all we need to be able to show then is there is that inference. And then let us do our discovery. Let us go in and find that agreement if there is one. Let us go in and be able to prove these facts and meet our burden in that regard to show it. We simply, when it comes to, as one court said, that the key to the access to the court, clearly, are the pleading standards. And we understand the need, clearly, and respect the need of the pleading standards to not just permit access, but to protect an accused, to put them on notice of what they're facing. And we would argue that it is very clear, from what has been alleged, that they know exactly what we're saying. They're on notice as to what they have to do to try and defend themselves. They know exactly what discovery we're going to be looking for. So in this case, it's met. Opportunity to have access and to go in and do discovery and prove our case. That test being a reasonable expectation, that discovery may lead to those facts to prove our case with a standard. At the same time, they're fairly on notice to know exactly what they're facing. And to me, that gives us that chance. You spend a lot of time in the complaint talking about what you perceive to be the bad actions of State Farm. And then the other insurance companies are simply saying, I want to pay the State Farm rate. How do you link just that mere statement? I don't know what the State Farm rate is, but I know you're paying them one, so I want that same benefit of that bargain. How does that get you into a conspiracy? Well, in the sense that rather than just consciously good business practice, follow the leader is what you're saying, Your Honor, right? Is that they wouldn't do that unless there was this agreement in place that had this overall benefit down the road to the insurance companies. Why? If State Farm has the lowest rate, that to me is a business interest. You've suggested there might be other business interests, but why are we going to second guess if they want the lower rate and they just say I want that one? How is that? How do you get into a conspiracy? To then state the next is that if State Farm, when they do raise the rate, which would be completely contrary to the small insurance company's interest, they raise their rates as well, following the leader downward in this orchestrated spiral that we're suggesting at the end of the day we want to be able to prove. And so could it be just follow the leader, just conscious parallelism? It could be, but we don't have to prove the negative. We have to be able to show that there is a plausible inference. You have to move the needle beyond equipoise, do you not? Absolutely. That's why I'm saying just to that, not a heightened standard in antitrust actions to Twombly, but that plausible inference. Enough facts to suggest a plausible inference, that there was something more than just follow the leader. And to that end, we asked you in this briefing to identify specifically the allegations that would lead to the counts that you're raising. And you gave us several pages of bullet points, but noticeably they're not tied to any paragraph of the complaint. And in some cases, you're using words in the brief that don't appear in the complaint at all. We do that in using the word script. We don't use the word script in the complaint, but certainly when we're alleging uniformity in all the punishments, if you will, for noncompliant shops, the steering, that they're subject to a script. They're doing the same thing. They're doing the identical behavior. And what we're trying to argue is that for that, to answer that question, we believe that the next step, the boycotting, the steering people away uniformly to force compliance with their set rate adds to the suggestion, the inference, that in fact it is an artificial rate that they agreed to as part of this overall scheme. Thank you, Mr. Shurtleff. Thank you, Your Honor. I give you 4 or 5 in reply. Mr. Fenton. Sorry, Your Honor. I believe I had asked for 12 minutes. I have three on my sheet. I believe that's for Mr. Kenney. 12 is for me. Mr. Kenney gets three. Hearing no objection from Mr. Kenney, we will rearrange. All right. You've got 12. Mr. Kenney looks kind of relieved, actually. Thank you, Your Honor. My name is Rick Fenton, and I represent the Allstate Companies, and my remarks this morning, however, are on behalf of all defendants. In dismissing the actions below, the district court correctly applied the pleading standards set forth by the Supreme Court in Twombly and Equal, and by this court in Almanza, American Dental, and Jacobs v. Tempur-Pedic. And it should be affirmed in all respects, including the dismissal of the state law claims. In its briefing notice, this court asked whether a per se illegal price-fixing conspiracy or a per se illegal boycott may be plausibly inferred from the allegations of these complaints. The answer is no. Is that different from your answer to the panel? I listened to the oral argument of that case, and it seemed to me that Judge Rothstein asked you if the plaintiffs had alleged an agreement, and you seemed to agree that they had. Well, if that's what's on the transcript, Your Honor, I certainly never intended to say that. The word agreement does appear, but they never plead any direct agreement. They try, as Judge Presnell noted, to infer an agreement from parallel conduct, and they do not set forth sufficient plus factors to move the needle, so to speak. You said they allege it in very conclusory terms, but that's at about 25 minutes thereabouts in the oral argument, right? Well, but the only facts that they plead to prove an agreement is the parallel conduct. Well, I understand you saying that now, but my point is I understood you to say something different in the panel. I don't believe I did, Your Honor, and certainly our briefs did not take that position. Well, the tape speaks for itself. Do they have to allege a specific agreement or simply in order to get past a 12b6 motion to dismiss the inference of an agreement? I thought the Supreme Court says all you need is to allege an inference of an agreement in order to move the case forward. Well, I think what the Supreme Court said in Twombly and in Iqbal is that you have to have enough factual heft to show that there's an agreement. That can be done either through direct evidence, the parties sat down and agreed to X, Y, and Z, or it can be done inferentially through circumstantial evidence, which is more than just conscious parallelism. So when you allege that all 89 insurance companies agree to abide by the same market rate in all of the states that are alleged, that that's not enough to infer an agreement to get past the 12b6 motion to dismiss? Well, I don't think that conclusion would be enough, Your Honor, but that's not what's pleaded here. What's pleaded here is that State Farm arrived at a rate, and its competitors have said that they don't want to pay more than their largest competitor, State Farm. State Farm, the actions alleged against State Farm are basically unilateral actions on State Farm's part. There's no separate allegations against the other defendants, except they say, as any buyer of services would, I don't want to pay more than my competitor. How is the market rate determined? Well, according to the allegations of the complaint, State Farm conducts on its own a survey, and it sets reimbursement rates for the body shops in its DRP program. Is there any allegation about whether or not those market rates are below what body shops, for example, charge in a given jurisdiction? No, Your Honor. There is no allegation of that type. As a matter of fact, the DRP shops, the allegation is, are perfectly happy to accept those rates. Which brings me to another point. What the plaintiffs are really complaining about is they don't want to have to meet the rates that the DRP shops are willing to accept. That's not price fixing. That's price competition. Well, that's your interpretation of the complaint. But at the same time that Twombly says you have to do enough to make a complaint plausible, Twombly also says that a judge can't dismiss a complaint just because he or she thinks that it's likely and probable that there will be sufficient proof to satisfy the allegations at the end of the day. No, but Twombly also says quite clearly that there have to be sufficient plus factors pleaded. And as Judge Branch pointed out, if you look at the plus factors that are listed in the plaintiff's brief, they're not tied to any allegations of the complaint. Many of them do not appear in the complaint. Others simply relate to unilateral conduct by State Farm. And others are simply nothing more than parallel conduct. And, indeed, I, in response to one of the questions from the panel, I don't believe that my dear friend, Mr. Shurtleff, identified any plus factors today other than parallel conduct. Uniformity in price and uniformity in practices. At what point can parallel conduct, if there's enough of it, suffice to provide an inference of an agreement? It has to be conduct that a competitor would not normally take in its own economic self-interest. Long-term or short-term? Long-term economic self-interest, or it could be short-term, I suppose, under some circumstances. That's not very certain, then, because a company can decide to take a short-term hit for long-term gain. So you might decide, you know what, it's not good for us in the short-term to agree to do this, but in the long-term it's going to help us because it will drive other people out of the market, and then we'll be able to take a more dominant role. Well, let's back up a little bit. First of all, we're talking here about price reimbursements, and we're talking about purchasers of services, not sellers of services, and I think that makes a difference in the analysis. Second of all, Your Honor, when a competitor says, I'm purchasing services, I don't want to pay more than the next guy, that's pure economic self-interest. If I go in to buy a car and I know my neighbor has gotten a good price, saying to the salesman, I want the same price you gave him, there's nothing – that's perfectly an economic self-interest. That hypothetical may not be the best that you just gave because those are buyers, not providers. And they have no market power. Providing services, Your Honor, if I am purchasing, let's say, a contractor's services. To flip your hypothetical around, those two people go to different dealers, and the dealers, despite their economic self-interest, are tied to the same price of a car. Does that give rise to any inference of an improper agreement? Absolutely not, Your Honor. As a matter of fact, you go to most retailers now, they will give you a price guarantee. If you can get the same thing from our competitor at a lower price, we'll match it or beat it. That's not conspiracy. It's parallel conduct. What about the higher price? I'm sorry, Your Honor, I'm not sure I understand the higher price. What about a higher price? Well, a purchaser of services would not want to pay a higher price. That would not be in their self-interest. That's correct. So you have two car dealers who set a price, and buyers think that that is artificially high. No problem? Well, buyers, if they think it's artificially high, don't have to buy. Of course not. They never have to buy. But I don't think you can infer just because two different dealers are selling a Toyota for a list price, let's say, when other buyers can get lower. I don't think you can infer an inference of conspiracy from that alone. Even if it's not in their economic self-interest to do so? Well, it may be in their economic self-interest to do so, Your Honor, but the plus factor that has to be alleged is something that would show that it is not in the insurance company's economic self-interest to pay a lower price. That hasn't been alleged. And the same competitive forces that would tell an insurance company, I don't want to pay more than State Farm, are exactly the same competitive forces that would lead insurance companies to try to obtain services at the lowest cost. For example, by saying to their customers, you know, the prices over here are a little high. You may want to go to this body shop over there. That's not evidence of conspiracy. That's evidence of a company controlling its costs. And that's how companies compete. Well, if the answer is that the companies are just controlling their costs, isn't that the type of information that you traditionally would find in an answer to the complaint? No, Your Honor. This Court in American Dental came out in exactly the other direction and granted a motion to dismiss in very similar circumstances, facing the same kind of allegation where the insurance companies were monitoring medical bills, they were bundling services, they were saying we'll pay for this, we won't pay for that, same kinds of allegations you have here about market practices. And this Court held that that was all in the economic self-interest. Did that case involve a buyer's cartel or a seller's cartel? That involved reimbursement for medical services, so it's very similar to this situation. And I also have to say, and this ties into something Judge Karnes asked, we're not talking here about prices. As Judge Karnes stated, the plaintiffs are perfectly free to charge whatever prices they want, provided the consumer is willing to pay the difference between that and what the insurance company is willing to reimburse. And that's not price-fixing. I'd like to say just a few words about the conclusory nature of these pleadings. When one looks at Iqbal and Twombly, and one talks about the kind of factual heft that is needed, as to all of the defendants other than State Farm, there are virtually no allegations other than their place of incorporation and their place of business. I don't know from this complaint what my clients are alleged to have done wrong, either on the federal claims or on the state claims. For example, in tortious interference, there is not a single business expectancy that has been pleaded here. So we think the pleading efficiency is... But Chief, I mean, just to be sure, all three members of the panel agree that the district court should be reversed on the tortious interference claim, and that's not before the en banc court, is it? Yeah, that's the third issue that's before us, isn't it? It is certainly before the en banc court. The panel's opinion was vacated, and with all due respect to both Judge Wilson and Judge Anderson, we disagree on the tortious interference claim. And you briefed it, right? We absolutely briefed it. And if I could say just one word about the quantum merit claims, one of the points that I think Judge Anderson raised in his dissent from the panel opinion, and we find very salient, is that the district court had done a very thorough analysis of the state laws, and there was virtually no eerie analysis in the panel opinion. These are important and, frankly, evulsive changes in the laws of four states. We don't think that the panel opinion gave that enough thought, and we're concerned about the preclusive effect that Judge Anderson talked about. My time is up. If there's no more questions for me, I'll turn it over to Mr. Kenney. Thank you, Mr. Fitton. Mr. Kenney, three minutes. May it please the Court, Michael Kenney on behalf of State Farm. There were some questions about plus factors. Here's what the Eleventh Circuit in the Williamson Oil case said about plus factors in a Section 1 case involving circumstantial evidence. This is a direct quote. It's at 346 F. 3rd 1310. If a benign explanation for the action is equally or more plausibly than a collusive explanation, the action cannot constitute a plus factor. That quote and that standard leads directly into this Court and the panel's two questions  In this case, there are innumerable allegations with regard to State Farm acting unilaterally. What did State Farm do unilaterally? State Farm engaged in conduct designed to contain its costs. That is conduct that State Farm would undertake absolute agreement. In the City of Tuscaloosa v. Hargrove's case, another circumstantial case, Section 1 case based on circumstantial evidence, this Court asked this penetrating question. But we really don't know whether or not there was an agreement unless discovery is conducted in this case. Isn't that right? Isn't that true? That's exactly what Twombly says, Your Honor. What Twombly says in a case that's – remember the question presented to the Supreme Court in Twombly, what is the pleading standard in a Section 1 case based on – There are monthly industry meetings that are secret and not open to the body shops. I think – That's one of the allegations in the complaint that supports the plus factors is that the insurance companies have secret monthly meetings. What Your Honor I think is referring to is an allegation that there was a meeting in April of 2013 in Mississippi involving the Department of Insurance and State Farm representatives, and there was a vague reference about an industry meeting with absolutely no explanation of what happened at the meeting. But there are monthly secret meetings, though, right? I don't know if I would call them secret. The allegation is that the body shops who were in Mississippi asked if they could attend a meeting, and they were told no. The laws are on it. Body shops can't attend the insurance company meetings. The insurance companies can attend the body shops' meetings, but they can't – they can't attend the insurance company monthly secret meetings. That's not – I think that's alleged in the complaint. That's not – That's alleged with regard to what happened in Mississippi with no allegation of who attended those meetings on behalf of the insurance company, whether any of the defendants in any of these five cases, and as the American Dental Court noted, that long before Twombly – Well, if there was – if there was discovery in this case, then it's possible that there might be minutes of those meetings? That could have been true in Twombly, Your Honor. The question isn't whether discovery might lead to the possibility of discovering evidence. The question is, on face, do the allegations plausibly suggest a conspiracy and – and that's what this Court did in the Tempur-Pedic case. It did in Almanza. It did in American Dental. The Supreme Court did it in Twombly. The Supreme Court did it in Iqbal. And that is, if there is an obvious alternative explanation for the conduct that's alleged, then the case should be dismissed. But isn't that – but isn't that what you put in an answer, though? No. They put that in your motion to dismiss because the plaintiffs haven't plausibly suggested allegations that give rise to an inference of a conspiracy. Mr. Chief, I have one question that I'd like to ask on the tortuous interference. I understand Mr. Fenton's argument that as to all the other insurance companies besides State Farm, there is perhaps sparse allegations that would relate to tortuous interference. But with respect to State Farm, are there not enough allegations? I mean, there are a lot of allegations about how State Farm falsifies the survey and so forth. Why is there not a tortuous interference claim stated against State Farm? Yes, Your Honor. Because the allegations that are specific to State Farm have nothing to do with the actual interference of State Farm with a customer in a body shop. They relate to whether, in fact, State Farm prepares a market survey to determine a market rate. That has nothing to do with an interference with a relationship between a body shop and a policy. And then, however, it does – the complaint does allege that in order to steer problem shops away – in order to steer the insureds away from problem shops, the excuses are false with respect to charge more, take longer, et cetera. Those allegations are not unique to State Farm. I tried once before to convince Your Honor that Iqbal – what Iqbal holds is if the two-step inquiry, you can – the court should reject them. All of those allegations are conclusory allegations. And for that reason, what Iqbal says is it's the wholly conclusory nature of the allegation, not the extravagantly fanciful nature of the allegation, that disentitles them to the presumption of truth. That's why the tortuous interference claim fails as to all of the defendants here, because those allegations are nothing but conclusory. Thank you, Mr. Kinney. Mr. Goldfein, five minutes. My name is Dan Goldfein. I represent GEICO. GEICO speaks separately to address why plaintiff's allegations of a price-fixing agreement and group boycott are insufficient as a matter of law to permit this court to infer a per se violation of the Sherman Act. One of the elements of a Sherman Act violation is the conduct is, in fact, anti-competitive. There's two ways to prove that. One's the rule of reason. One's the per se rule. The rule of reason is the presumptive test, and plaintiffs must plead basis for the per se test to apply instead. Plaintiffs have not done that. For the per se test to apply, it's not enough to allege that they lost money. They have to allege that there's manifestly anti-competitive effects, no pro-competitive benefit. And previous court experience, not only with the conduct involved, but with the context involved. And the context here is unique. Plaintiffs have not addressed that. They've only alleged the labels that justify a per se violation, and that's not enough under the case law. As I indicated, we're talking about a unique business activity here. This is not a challenge to a typical buyer-seller relationship. There are three, sometimes four, parties involved in each transaction. And each transaction's informed by the interpretation and execution of the between insurance companies, insureds, and then the duties to claimants. As a result, you get a two- or three-sided separate but related transaction. And our conduct involves reimbursement, not the payment. It's the insureds and the claimants that pay the body shops. That's not been addressed by this court or any court in a way that would allow the per se rule to apply. Further confirming that is the Iqbal-Twombly rubric here. So if we take a look at each of the allegations in the complaint that are allegedly support an inference of anti-competitive conduct here, they're all conclusory. They have to be struck under Iqbal and Twombly. And what you're left here, at least to the element of anti-competitiveness, is nothing. There is no way for us defendants to know what we did that's anti-competitive as opposed to merely cost containment conduct. Therefore, we're not left with notice as to what the Sherman Act violation here. And it's the plaintiffs that have deliberately decided to pursue the per se only test, per se only rule here in this case. But if you – I know you think that the allegations are insufficient. But if there were enough allegations that your client and the other companies had gotten together to fix the rates, that would be a problem, right? This case would get beyond the Rule 12b6 stage. To fix the reimbursement rates? Yes. No. In this case, I would say no because they've split. Wait, wait. I'm getting away from the allegations in this case now. If there are allegations that the top representatives of all of these companies got together in a room and said, we are going to fix and depress prices, it will be to all of our benefits to do that. How do we best do that? And they work for a weekend and they come up with a set of rates and it's all agreed to and they all sign a secret agreement and then they tell all their people, this is our rate. That's our rate and it's all the same rate. You'd get past the 12b6 stage, would you not? First of all, let me understand the hypothetical. The prices you're talking about in the hypothetical are not the prices maybe charged to insurers. You're talking about prices that the insurers and claimants would pay to body shops? No. No, it's the prices that your clients are reimbursing body shops for work. No matter what the market rate is. Let's say that it costs, to just put an artificial number on it, it costs $100 to replace a hood, right? Just using that number. And the representatives of all of these companies get together and they say, you know what, we need to make more money. And so regardless of what a hood really costs, we're just going to pay $25 for the hood. Will you agree to pay $25 for the hood? Yes. You, yes. And everybody agrees that they're going to now, the next day, announce that they're paying $25 for the hood. That would be a problem for you, right? You'd get past the 12b6 stage with regard to the existence of an anti-competitive agreement. Would you not? The answer is no because here they've decided to make it, if you let me finish the answer, a deliberate choice to do a per se case only. That may or may not be a rule of reason case. My question was not limited to a per se case. Then I would say yes to your answer if it's not limited to a per se case. If you have that, if you have that, you get past the pleading stage of a case. If it's not limited to a per se case, if it's both a per se case and a rule of reason case, but here the plaintiffs have deliberately chosen to bring a per se only case. And in that light, the case would not, your hypothetical, would not state a per se claim here. Why would it not state a per se claim? Because we're involved in That's per se anti-competitive. You're depressing prices artificially and you're doing it in concert. No, what you've asked us to, what you've said is that the reimbursement rates have been suppressed. Yes. And that's a different issue that's not been taken to court, and we do not know. We don't have a basis, certainly not a basis on these allegations, to know that that conduct was anti-competitive. How could that not be anti-competitive? Give me a possibility. For example, here, if it's part of the DRP arrangements that are being alleged here. No, they're not in my hypothetical. Everybody got together and they artificially depressed rates that had no bearing to the market rates that were really being charged and paid. How could that not be anti-competitive? Counsel, the answer is of course yes. You destroy your credibility by saying a bunch of people can get together in a room and conspire against the people that they serve, that they resell to, that they're re-embarrassed to about price, and you have to think real hard about whether that's a violation. Of course it is. Under the rule of reason, as I indicated before, it would be a violation, but they've chosen deliberately to not pursue their rule of reason case. We'll take that as a you agree. Well, let me ask one more question now. Of course, we don't know whether or not that's the case here, because all of that information is within the exclusive possession and control of the insurance companies because their monthly meetings are secret, right? Well, first let me take a step back. I don't believe the allegations and the complaints support a reasonable inference that they have monthly secret meetings. One person at a meeting involving state officials of the state of Mississippi, if you accept the truth of the allegation, said that there are monthly industry meetings in Mississippi, a state not involved in this case. There's no other allegation that would support that inference, and I don't think that's a reasonable inference here. Let me ask you one thing. The argument you have made is moot if we hold that there are not enough allegations, not sufficient to infer an agreement or conspiracy. Is that not true? It's unnecessary. Thank you, counsel. Mr. Shirkwood, you've got five minutes. Let me ask you one question, which I know is on everybody's mind. When a customer goes into a collision or repair shop, they have gotten car damage, had a wreck, need you to fix it, the first question they ask is, is this an insurance case? The reason they ask that is they can charge you more if it's not an insurance case. Isn't that true? I don't know that that is true. They've just taken a survey to see how the insurance industry is doing. We probably could. That's not what we've alleged, but I'm—so let me say yes. Okay, let's say that happens. So then your question would be, Your Honor— I just want to know how to answer the question in the future. Actually, I'm being facetious. It relates back to who's being protected with these allegations, whether it's the consumers of the repair services or the repair shops. And if I could take that and then go back to your earlier question, your concern that you raised about the fact that a consumer or a customer, uninsured, has a right to have their car returned to a pre-accident condition, if at all possible. And what we're alleging and what we have alleged is that that's not being allowed to happen because of this alleged conspiracy agreement and steering people away and requiring inferior parts, et cetera. At the end of the day, that's anti-competitive. That's harmful to the consumer. Financially, it's harmful to them. Because if they have to go back, inferior, jerry-rigged bumper that doesn't really fit, have to draw new holes, et cetera, or a steering column that's not quite right because it's not the manufacturer part, where the tire's wrong, it's going to add to more and more costs to that consumer. Aren't you describing a class action complaint by the insurance consumers, the purchasers of insurance? I mean, that seems to be what you're describing. You're not describing what's happening to the body shops here. Well, it is to the extent that to those body shops who do not comply, who are then on the outs and who then have clients steered away from, their feeling is they have a duty to their customer to make it right, and they will not pass on those extra costs to the company, so they're eating it. The insurance companies know this, which then is harmful to their business and ultimately may drive them out of business because they will not pass on those additional costs to make that car safe. So, yes, there are separate cases. In fact, they're out there of safety issues and so forth. But that's not what we're talking about. No, we're saying in this case it's harmful and knowingly harmful. It actually designed this way, as I said before. Under your position, the insurance companies would be required to pay whatever the collision repair shops deem is necessary. And appropriate. Yeah, and we've alleged in the complaint this, and it was actually brought out, that there are three databases that do the estimates. And the fact is, as part of one of our arguments suggesting super plus factors in agreement, is that State Farm doesn't always follow that. In fact, we have alleged in one case, Safeco, where the employee said, look, we're being told by the company, you know, those databases are there that supposedly have a fair cost. We're being told only pay what the database says if it's beneficial to us. So if the database estimate comes out and says the cost is lower, you pay lower. If it says higher, you only pay what we agree that rate is going to be. And we bargained that as uniform across the board. That seems to be totally in their interest. Yes. And their economic interest, isn't it? Yeah. In that sense, I knew, Judge, one of you would ask that question, that they would do it that way. Of course they do it that way. What else would they do? Well, maybe the answer is that all anti-competitive conduct is in someone's economic interest. Right? What he said. Most anti-competitive conduct inures to the benefit of somebody or else it wouldn't be undertaken. That may not get you, you know, far in this case, but there's always usually an economic motive for conduct that's undertaken, whether it's legal or not. Correct. I agree with that. Now, if I could go to Judge Branch. Consumers, though, of the product that your clients sell are basically the insurance companies, right? I'm sorry. Consumers of the product that your clients sell basically are insurance companies, right? And they want to pay less. That's not anti-competitive. But they want to pay more, and we do allege that. Pardon me? When they want to pay more, if I want, as an insurance company, I want to have something unique, different. The only way I can compete against State Farm or Farmers or Geico and I'm a small business. Now, there's a lot of ways I can compete against them. I can have better advertising. I mean, Geico's got awesome commercials. They do. There's all kinds of things they can do to compete against each other, and it's not all what happens with the price they pay for repair parts at the body shop. That is really the only way advertising. But is advertising, at the end of the day, helpful to the consumer? How does that, in fact, benefit the consumer? Are we going to outlaw advertising? Huh? Because we're seeing more and we're told that we ought to be having Geico instead of this one? At the end of the day, if they spend money to me, it would be. . . If I want to gain an advantage by having a quality. . . I'm sorry? We don't know whether or not the insurance companies pass those alleged cost savings on to the consumers through lower insurance premiums. Right. Do we? No. Thank you, Counsel. We'll take that case under submission with the others and stand in recess. All rise.